# Exhibit B

# FEDERAL EMPLOYEES
# HEALTH BENEFITS PROGRAM

*Standard Contract
Amendment*

**For**

**Fee-For Service Carriers**

# 2012

(FFS-2012)

# AMENDMENT TO CONTRACT CS XXXX

CONTRACT NO: 1039
EFFECTIVE: January 1, 1960

AMENDMENT NO. 2012A
EFFECTIVE: January 1, 2012

BETWEEN:    THE UNITED STATES OFFICE OF PERSONNEL MANAGEMENT
*hereafter called the OPM, the Agency, or the Government*

        Address:        1900 E Street, NW
                                Washington, DC 20415-3610

        AND

        CONTRACTOR: Blue Cross and Blue Shield Association
                        *hereafter also called the Carrier*

        Address:        1310 G Street, N.W., Suite 900
                                Washington, DC 20005

In consideration of payment by the Agency of subscription charges set forth in Appendix B, the Carrier agrees to perform all of the services set forth in this contract, including Appendix A.

FOR THE CARRIER                FOR THE GOVERNMENT

Jena L. Estes                    Sylvia V. Pulley

Name of Person Authorized to        Name of Contracting Officer  (Type or print)
Execute Contract (Type or print)

Vice President, FEP                Chief, Health Insurance I, Federal Employee
                                        Insurance Program

Title                                 Title

Signature                        Signature

12/31/11                        12/27/11

Date Signed                    Date Signed

1. Section 1.9 Plan Performance-Experience-Rated FFS Contracts (JAN 2012). We updated (3) to be consistent with new Fraud and Abuse reports.

    (a) Detection of Fraud and Abuse. The Carrier shall conduct a program to assess its vulnerability to fraud and abuse and shall operate a system designed to detect and eliminate fraud and abuse internally by Carrier employees and subcontractors, by providers providing goods or services to FEHB Members, and by individual FEHB Members. The program must specify provisions in place for cost avoidance not just fraud detection, along with criteria for follow-up actions. The Carrier must submit to OPM an annual analysis of the costs and benefits of its fraud and abuse program. The Carrier must submit annual reports to OPM by March 31 addressing the following:
   1) Cases opened;
   2) Dollars identified as lost and recovered on active cases
   3) Actual savings and prevented loss on active cases;
   4) Active cases referred to law enforcement (other than the OPM-OIG)
   5) Active cases referred to OPM – OIG;
   6) Active cases resolved administratively;
   7) Percentage of active cases where the FEHB Program is the only or primary line of business affected
   8) Number of FEHB providers who are on prepayment review; and
   9) Number of arrests and criminal convictions resulting from active cases
The report will also include the industry standards checklist.

2. Section 1.31 Definition and Scope of Information Security (JAN 2012). We have revised (b) to include 1.35 as this section only refers to LOC System.

    (a) As indicated in FAR Subpart 2.1, information security means protecting OPM information and information systems from unauthorized access, use, disclosure, disruption, modification, or destruction in order to provide —
   1. Integrity, which means guarding against improper information modification or destruction, and includes ensuring information nonrepudiation and authenticity; or destruction.
   2. Confidentiality, which means preserving authorized restrictions on access and disclosure, including means for protecting personal privacy and proprietary information; and
   3. Availability, which means ensuring timely and reliable access to, and use of, information.
    (b) This Contract grants the Carrier access to OPM's Letter of Credit (LOC) System. The Carrier recognizes its responsibility to help maintain the information security of OPM's LOC System. Section 1.31 through 1.35 inclusive and Section 5.67 and 5.68 pertain exclusively to such limited access to OPM's LOC System.

3. Section 1.32 Carrier Personnel Access Determination Requirements (JAN 2012). We corrected a typographical error in (b).

    (a) Carrier personnel who receive a user identification and password to access OPM's LOC System shall comply with the U.S. Office of Management and Budget (OMB) Memorandum M-05-24, referenced in paragraph (a) of FAR 52.204-9, Personal Identity Verification of Contractor

Personnel, which is available on-line at
http://www.whitehouse.gov/omb/memoranda/fy2005/m05-24.pdf.

    (b) ) Homeland Security Presidential Directive (HSPD) 12 requires the Government to institute standards for secure and reliable identification of employees and contractors accessing Federal facilities. OPM has determined that a National Agency Check with Written Inquiries (NACI) is required for Carrier employees with access to OPM's LOC System. The Carrier must obtain these access determinations for its employees with access to OPM's LOC System using the e-QIP system. The NACI will be requested on a Standard Form (SF) 85, "Questionnaire for Non-Sensitive Positions." OPM will not allow Carrier employees who have not completed the NACI process in any of its facilities, pursuant to applicable security policies.

    (c) Carriers must meet facility and access clearance requirements.

    (d) Carriers are responsible for the security, integrity and appropriate authorized use of their systems interfacing with OPM's LOC System. OPM, through its Contracting Officer, may require the use or modification of security and/or secure communications technologies related to Government systems access and use.

    (e) OPM, at its discretion, may suspend or terminate the Carrier's access to and/or use of OPM's LOC System when a security or other electronic access, use or misuse issue gives cause for such action. The suspension or termination may last until such time as the Government determines that the situation has been corrected or no longer exists.

4. <u>Section 1.36 Carrier's Key Personnel</u> (JAN 2012). We are adding this clause to indicate the carrier's responsibilities when removing or replacing personnel and to indicate the OPM's Contracting Officer's role in the event of unsatisfactory carrier personnel.

    (a) For the purposes of this section, "key personnel" are the individual(s) who serve as the Carrier's primary contact(s) with OPM or have significant supervisory responsibility for the Carrier's performance of its FEHB contract. These individuals shall be designated as "Key Personnel" in Appendix G.

    (b) Prior to removing, replacing or diverting key personnel, the Carrier shall notify the Contracting Officer of the planned removal, replacement or diversion. This notification must include a description of the substitute personnel's qualifications and address the potential impact on contract performance. This notification must be no later than five (5) business days in advance of any planned removal, replacement or diversion of key personnel. Notwithstanding the foregoing, if the Carrier deems advance notice of the removal, replacement or diversion of key personnel impracticable under the circumstances, the Carrier shall notify the Contracting Officer with the required notification as indicated above within five (5) business days following such personnel action.

    (c) In the event that key personnel voluntarily resign, retire or otherwise separate their employment from the Carrier, the Carrier shall notify the Contracting Officer within five (5) business days following receipt of the key personnel's notice of such action.

    (d) In the event that the performance of assigned key personnel or any substitute(s) is determined by the Government to be unsatisfactory at any time during the life of the Contract, the Government reserves the right to request and receive satisfactory personnel replacement within five (5) calendar days of receipt by the Carrier of written notification. Notification will include the reason for requesting replacement personnel.

    (e) The Carrier-supplied personnel are employees of the Carrier and under the administrative control and supervision of the Carrier. The Carrier, through its personnel, shall perform the tasks prescribed herein. The Carrier must select, supervise, and exercise control and

direction over its employees and subcontractors under this Contract. The Government shall not exercise any supervision or control over the Carrier in its performance of contractual services under this contract. The Carrier is accountable to the Government for the action of its personnel.

5.  Section 3.16 Reportable Findings (JAN 2012).  We are adding this section to indicate that findings identified during OPM/OIG audits are reportable unless the carrier can support that it identified and corrected the issue prior to audit notification.

Audit findings in the scope of an OIG audit are reportable as questioned charges unless the Carrier provides documentation supporting that the findings were identified (e.g., written notice of erroneous payments) and corrected (i.e., overcharges returned to the FEHBP) prior to audit notification.

(FFS-2012)

# FAR Clauses

## 1. Section 5.5 Anti-Kickback Procedures (OCT 2010) (FAR 52.203-7).

(a) Definitions.

"Kickback," as used in this clause, means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime Contractor, prime Contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

"Person," as used in this clause, means a corporation, partnership, business association of any kind, trust, joint-stock company, or individual.

"Prime contract," as used in this clause, means a contract or contractual action entered into by the United States for the purpose of obtaining supplies, materials, equipment, or services of any kind.

"Prime Contractor," as used in this clause, means a person who has entered into a prime contract with the United States.

"Prime Contractor employee," as used in this clause, means any officer, partner, employee, or agent of a prime Contractor.

"Subcontract," as used in this clause, means a contract or contractual action entered into by a prime Contractor or subcontractor for the purpose of obtaining supplies, materials, equipment, or services of any kind under a prime contract.

"Subcontractor," as used in this clause, (1) means any person, other than the prime Contractor, who offers to furnish or furnishes any supplies, materials, equipment, or services of any kind under a prime contract or a subcontract entered into in connection with such prime contract, and (2) includes any person who offers to furnish or furnishes general supplies to the prime Contractor or a higher tier subcontractor.

"Subcontractor employee," as used in this clause, means any officer, partner, employee, or agent of a subcontractor.

(b) The Anti-Kickback Act of 1986 (41 U.S.C. 51-58) (the Act), prohibits any person from --

(1) Providing or attempting to provide or offering to provide any kickback;

(2) Soliciting, accepting, or attempting to accept any kickback; or

(3) Including, directly or indirectly, the amount of any kickback in the contract price charged by a prime Contractor to the United States or in the contract price charged by a subcontractor to a prime Contractor or higher tier subcontractor.

(c)(1) The Contractor shall have in place and follow reasonable procedures designed to prevent and detect possible violations described in paragraph (b) of this clause in its own operations and direct business relationships.

(2) When the Contractor has reasonable grounds to believe that a violation described in paragraph (b) of this clause may have occurred, the Contractor shall promptly report in writing the possible violation. Such reports shall be made to the inspector general of the contracting agency, the head of the contracting agency if the agency does not have an inspector general, or the Department of Justice.

(3) The Contractor shall cooperate fully with any Federal agency investigating a possible violation described in paragraph (b) of this clause.

(4) The Contracting Officer may (i) offset the amount of the kickback against any monies owed by the United States under the prime contract and/or (ii) direct that the Prime Contractor

withhold, from sums owed a subcontractor under the prime contract, the amount of the kickback. The Contracting Officer may order the monies withheld under division (c)(4)(ii) of this clause be paid over to the Government unless the Government has already offset those monies under subdivision (c)(4)(i) of this clause. In either case, the Prime Contractor shall notify the Contracting Officer when the monies are withheld.

(5) The Contractor agrees to incorporate the substance of this clause, including this paragraph (c)(5) but excepting paragraph (c)(1), in all subcontracts under this contract which exceed $150,000.

## 2. Section 5.7 Audit and Records-Negotiation (OCT 2010) (FAR 52.215-2).

(a) As used in this clause, "records" includes books, documents, accounting procedures and practices, and other data, regardless of type and regardless of whether such items are in written form, in the form of computer data, or in any other form.

(b) *Examination of costs*. If this is a cost- reimbursement, incentive, time-and-materials, labor-hour, or price redeterminable contract, or any combination of these, the Contractor shall maintain and the Contracting Officer, or an authorized representative of the Contracting Officer, shall have the right to examine and audit all records and other evidence sufficient to reflect properly all costs claimed to have been incurred or anticipated to be incurred directly or indirectly in performance of this contract. This right of examination shall include inspection at all reasonable times of the Contractor's plants, or parts of them, engaged in performing the contract.

(c) *Certified cost or pricing data*. If the Contractor has been required to submit certified cost or pricing data in connection with any pricing action relating to this contract, the Contracting Officer, or an authorized representative of the Contracting Officer, in order to evaluate the accuracy, completeness, and currency of the certified cost or pricing data, shall have the right to examine and audit all of the Contractor's records, including computations and projections, related to—

(1) The proposal for the contract, subcontract, or modification;

(2) The discussions conducted on the proposal(s), including those related to negotiating;

(3) Pricing of the contract, subcontract, or modification; or

(4) Performance of the contract, subcontract or modification.

(d) *Comptroller General* -- (1) The Comptroller General of the United States, or an authorized representative, shall have access to and the right to examine any of the Contractor's directly pertinent records involving transactions related to this contract or a subcontract hereunder and to interview any current employee regarding such transactions.

(2) This paragraph may not be construed to require the Contractor or subcontractor to create or maintain any record that the Contractor or subcontractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e) *Reports*. If the Contractor is required to furnish cost, funding, or performance reports, the Contracting Officer or an authorized representative of the Contracting Officer shall have the right to examine and audit the supporting records and materials, for the purpose of evaluating-- (1) The effectiveness of the Contractor's policies and procedures to produce data compatible with the objectives of these reports and (2) The data reported.

(f) *Availability*. The Contractor shall make available at its office at all reasonable times the records, materials, and other evidence described in paragraphs (a), (b), (c), (d), and (e) of this clause, for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in Subpart 4.7, Contractor Records Retention, of the

Federal Acquisition Regulation (FAR), or for any longer period required by statute or by other clauses of this contract. In addition--(1) If this contract is completely or partially terminated, the Contractor shall make available the records relating to the work terminated until 3 years after any resulting final termination settlement; and (2) The Contractor shall make available records relating to appeals under the Disputes clause or to litigation or the settlement of claims arising under or relating to this contract until such appeals, litigation, or claims are finally resolved.

(g) The Contractor shall insert a clause containing all the terms of this clause, including this paragraph (g), in all subcontracts under this contract that exceed the simplified acquisition threshold and--

(1) That are cost-reimbursement, incentive, time-and-materials, labor-hour, or price-redeterminable type or any combination of these;

(2) For which certified cost or pricing data are required; or

(3) That require the subcontractor to furnish reports as discussed in paragraph (e) of this clause. The clause may be altered only as necessary to identify properly the contracting parties and the Contracting Officer under the Government prime contract.

## 3. Section 5.8 Price Reduction for Defective Certified Cost or Pricing Data (AUG 2011) (FAR 52.215-10).

(a) If any price, including profit or fee, negotiated in connection with this contract, or any cost reimbursable under this contract, was increased by any significant amount because (1) the Contractor or a subcontractor furnished certified cost or pricing data that were not complete, accurate, and current as certified in its Certificate of Current Cost or Pricing Data, (2) a subcontractor or prospective subcontractor furnished the Contractor certified cost or pricing data that were not complete, accurate, and current as certified in the Contractor's Certificate of Current Cost or Pricing Data, or (3) any of these parties furnished data of any description that were not accurate, the price or cost shall be reduced accordingly and the contract shall be modified to reflect the reduction.

(b) Any reduction in the contract price under paragraph (a) of this clause due to defective data from a prospective subcontractor that was not subsequently awarded the subcontract shall be limited to the amount, plus applicable overhead and profit markup, by which (1) the actual subcontract or (2) the actual cost to the Contractor, if there was no subcontract, was less than the prospective subcontract cost estimate submitted by the Contractor; provided, that the actual subcontract price was not itself affected by defective certified cost or pricing data.

(c)(1) If the Contracting Officer determines under paragraph (a) of this clause that a price or cost reduction should be made, the Contractor agrees not to raise the following matters as a defense:

(i) The Contractor or subcontractor was a sole source supplier or otherwise was in a superior bargaining position and thus the price of the contract would not have been modified even if accurate, complete, and current certified cost of pricing data had been submitted;

(ii) The Contracting Officer should have known that the certified cost or pricing data in issue were defective even though the Contractor or subcontractor took no affirmative action to bring the character of the data to the attention of the Contracting Officer;

(iii) The contract was based on an agreement about the total cost of the contract and there was no agreement about the cost of each item procured under the contract; or

(iv) The Contractor or subcontractor did not submit a Certificate of Current Cost or Pricing Data.

(2)(i) Except as prohibited by subdivision (c)(2)(ii) of this clause, an offset in an amount determined appropriate by the Contracting Officer based upon the facts shall be allowed against the amount of a contract price reduction if--

(A) The Contractor certifies to the Contracting Officer that, to the best of the Contractor's knowledge and belief, the Contractor is entitled to the offset in the amount requested; and

(B) The Contractor proves that the certified cost or pricing data were available before the "as of" date specified on its Certificate of Current Cost or Pricing Data, and that the data were not submitted before such date.

(ii) An offset shall not be allowed if--

(A) The understated data were known by the Contractor to be understated before the "as of" date specified on its Certificate of Current Cost or Pricing Data; or

(B) The Government proves that the facts demonstrate that the contract price would not have increased in the amount to be offset even if the available data had been submitted before the "as of" date specified on its Certificate of Current Cost or Pricing Data.

(d) If any reduction in the contract price under this clause reduces the price of items for which payment was made prior to the date of the modification reflecting the price reduction, the Contractor shall be liable to and shall pay the United States at the time such overpayment is repaid—

(1) Interest compounded daily, as required by 26 U.S.C. 6622, on the amount of such overpayment to be computed from the date(s) of overpayment to the Contractor to the date the Government is repaid by the Contractor at the applicable underpayment rate effective for each quarter prescribed by the Secretary of the Treasury under 26 U.S.C. 6621(a)(2); and

(2) A penalty equal to the amount of the overpayment, if the Contractor or subcontractor knowingly submitted certified cost or pricing data which were incomplete, inaccurate, or noncurrent.

## 4. Section 5.10 Subcontractor Certified Cost or Pricing Data (OCT 2010) (FAR 52.215-12).

(a) Before awarding any subcontract expected to exceed the threshold for submission of certified cost or pricing data at FAR 15.403-4, on the date of agreement on price or the date of award, whichever is later; or before pricing any subcontract modification involving a pricing adjustment expected to exceed the threshold for submission of certified cost or pricing data at FAR 15.403-4, the Contractor shall require the subcontractor to submit certified cost or pricing data (actually or by specific identification in writing), in accordance with FAR 15.408, Table 15-2 (to include any information reasonably required to explain the subcontractor's estimating process such as the judgmental factors applied and the mathematical or other methods used in the estimate, including those used in projecting from known data, and the nature and amount of any contingencies included in the price), unless an exception under FAR 15.403-1 applies.

(b) The Contractor shall require the subcontractor to certify in substantially the form prescribed in FAR 15.406-2 that, to the best of its knowledge and belief, the data submitted under paragraph (a) of this clause were accurate, complete, and current as of the date of agreement on the negotiated price of the subcontract or subcontract modification.

(c) In each subcontract that exceeds the threshold for submission of certified cost or pricing data at FAR 15.403-4, when entered into, the Contractor shall insert either --

(1) The substance of this clause, including this paragraph (c), if paragraph (a) of this clause requires submission of certified cost or pricing data for the subcontract; or

(2) The substance of the clause at FAR 52.215-13, Subcontractor Certified Cost or Pricing Data - Modifications.

5. Section 5.14 Utilization of Small Business Concerns1 JAN 2011) (FAR 52.219-8)

     (a) It is the policy of the United States that small business concerns, veteran-owned small business concerns, service-disabled veteran-owned small business concerns, HUBZone small business concerns, small disadvantaged business concerns, and women-owned small business concerns shall have the maximum practicable opportunity to participate in performing contracts let by any Federal agency, including contracts and subcontracts for subsystems, assemblies, components, and related services for major systems. It is further the policy of the United States that its prime contractors establish procedures to ensure the timely payment of amounts due pursuant to the terms of their subcontracts with small business concerns, veteran-owned small business concerns, service-disabled veteran-owned small business concerns, HUBZone small business concerns, small disadvantaged business concerns, and women-owned small business concerns.

     (b) The Contractor hereby agrees to carry out this policy in the awarding of subcontracts to the fullest extent consistent with efficient contract performance. The Contractor further agrees to cooperate in any studies or surveys as may be conducted by the United States Small Business Administration or the awarding agency of the United States as may be necessary to determine the extent of the Contractor's compliance with this clause.

(c) Definitions. As used in this contract-- "HUBZone small business concern" means a small business concern that appears on the List of Qualified HUBZone Small Business Concerns maintained by the Small Business Administration. "Service-disabled veteran-owned small business concern"--

     (1) Means a small business concern--

     (i) Not less than 51 percent of which is owned by one or more service-disabled veterans or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more service-disabled veterans; and

     (ii) The management and daily business operations of which are controlled by one or more service-disabled veterans or, in the case of a veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran.

     (2) Service-disabled veteran means a veteran, as defined in 38 U.S.C. 101(2), with a disability that is service-connected, as defined in 38 U.S.C. 101(16).

     "Small business concern" means a small business as defined pursuant to Section 3 of the Small Business Act and relevant regulations promulgated pursuant thereto.

     "Small disadvantaged business concern" means a small business concern that represents, as part of its offer that--

     (1)(i) It has received certification as a small disadvantaged business concern consistent with 13 CFR part 124, Subpart B;

     (1)(ii) No material change in disadvantaged ownership and control has occurred since its certification;

     (1)(iii) Where the concern is owned by one or more individuals, the net worth of each individual upon whom the certification is based does not exceed $750,000 after taking into account the applicable exclusions set forth at 13 CFR 124.104(c)(2); and

     (1)(iv) It is identified, on the date of its representation, as a certified small disadvantaged business in the CCR Dynamic Small Business Search database maintained by the Small Business Administration, or

---

1 Section 5.14 only applies to plans participating in the small business pilot (none are experience-rated HMOs).

(2) It represents in writing that it qualifies as a small disadvantaged business (SDB) for any Federal subcontracting program, and believes in good faith that it is owned and controlled by one or more socially and economically disadvantaged individuals and meets the SDB eligibility criteria of 13 CFR 124.1002.

"Veteran-owned small business concern" means a small business concern--

(1) Not less than 51 percent of which is owned by one or more veterans (as defined at 38 U.S.C. 101(2)) or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more veterans; and

(2) The management and daily business operations of which are controlled by one or more veterans.

"Women-owned small business concern" means a small business concern--

(1) That is at least 51 percent owned by one or more women, or, in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more women; and

(2) Whose management and daily business operations are controlled by one or more women.

(d) (1) Contractors acting in good faith may rely on written representations by their subcontractors regarding their status as a small business concern, a veteran-owned small business concern, a service-disabled veteran-owned small business concern, a HUBZone small business concern, a small disadvantaged business concern, or a women-owned small business concern.

(2) The Contractor shall confirm that a subcontractor representing itself as a HUBZone small business concern is certified by SBA as a HUBZone small business concern by accessing the Central Contractor Registration (CCR) database or by contacting the SBA. Options for contacting the SBA include—

(i) HUBZone small business database search application web page at http://dsbs.sba.gov/dsbs/search/dsp_searchhubzone.cfm; or http://www.sba.gov/hubzone;

(ii) In writing to the Director/HUB, U.S. Small Business Administration, 409 3rd Street, SW., Washington, DC 20416; or

(iii) The SBA HUBZone Help Desk at hubzone@sba.gov.


6. Section 5.22 Equal Opportunity for Veterans (SEP 2010) (FAR 52.222-35).

(a) *Definitions.* As used in this clause—

*All employment openings* means all positions except executive and senior management, those positions that will be filled from within the Contractor's organization, and positions lasting 3 days or less. This term includes full-time employment, temporary employment of more than 3 days duration, and part-time employment.

*Armed Forces service medal veteran* means any veteran who, while serving on active duty in the U.S. military, ground, naval, or air service, participated in a United States military operation for which an Armed Forces service medal was awarded pursuant to Executive Order 12985 (61 FR 1209).

*Disabled veteran* means—

(1) A veteran of the U.S. military, ground, naval, or air service, who is entitled to compensation (or who but for the receipt of military retired pay would be entitled to compensation) under laws administered by the Secretary of Veterans Affairs; or

(2) A person who was discharged or released from active duty because of a service-connected disability.

*Executive and senior management* means—

(1) Any employee—

(i) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;

(ii) Whose primary duty consists of the management of the enterprise in which the individual is employed or of a customarily recognized department or subdivision thereof;

(iii) Who customarily and regularly directs the work of two or more other employees; and

(iv) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; or

(2) Any employee who owns at least a bona fide 20-percent equity interest in the enterprise in which the employee is employed, regardless of whether the business is a corporate or other type of organization, and who is actively engaged in its management.

*Other protected veteran* means a veteran who served on active duty in the U.S. military, ground, naval, or air service, during a war or in a campaign or expedition for which a campaign badge has been authorized under the laws administered by the Department of Defense.

*Positions that will be filled from within the Contractor's organization* means employment openings for which the Contractor will give no consideration to persons outside the Contractor's organization (including any affiliates, subsidiaries, and parent companies) and includes any openings the Contractor proposes to fill from regularly established "recall" lists. The exception does not apply to a particular opening once an employer decides to consider applicants outside of its organization.

*Qualified disabled veteran* means a disabled veteran who has the ability to perform the essential functions of the employment positions with or without reasonable accommodation.

*Recently separated veteran* means any veteran during the three-year period beginning on the date of such veteran's discharge or release from active duty in the U.S. military, ground, naval or air service.

(b) *General.*

(1) The Contractor shall not discriminate against any employee or applicant for employment because the individual is a disabled veteran, recently separated veteran, other protected veterans, or Armed Forces service medal veteran, regarding any position for which the employee or applicant for employment is qualified. The Contractor shall take affirmative action to employ, advance in employment, and otherwise treat qualified individuals, including qualified disabled veterans, without discrimination based upon their status as a disabled veteran, recently separated veteran, Armed Forces service medal veteran, and other protected veteran in all employment practices including the following:

(i) Recruitment, advertising, and job application procedures.

(ii) Hiring, upgrading, promotion, award of tenure, demotion, transfer, layoff, termination, right of return from layoff and rehiring.

(iii) Rate of pay or any other form of compensation and changes in compensation.

(iv) Job assignments, job classifications, organizational structures, position descriptions, lines of progression, and seniority lists.

(v) Leaves of absence, sick leave, or any other leave.

(vi) Fringe benefits available by virtue of employment, whether or not administered by the Contractor.

(vii) Selection and financial support for training, including apprenticeship, and on the job training under 38 U.S.C. 3687, professional meetings, conferences, and other related activities, and selection for leaves of absence to pursue training.

(viii) Activities sponsored by the Contractor including social or recreational programs.

(ix) Any other term, condition, or privilege of employment.

(2) The Contractor shall comply with the rules, regulations, and relevant orders of the Secretary of Labor issued under the Vietnam Era Veterans' Readjustment Assistance Act of 1972 (the Act), as amended (38 U.S.C. 4211 and 4212).

(3) The Department of Labor's regulations require contractors with 50 or more employees and a contract of $100,000 or more to have an affirmative action program for veterans. See 41 CFR part 60–300, subpart C.

(c) *Listing openings.*

(1) The Contractor shall immediately list all employment openings that exist at the time of the execution of this contract and those which occur during the performance of this contract, including those not generated by this contract, and including those occurring at an establishment of the Contractor other than the one where the contract is being performed, but excluding those of independently operated corporate affiliates, at an appropriate employment service delivery system where the opening occurs. Listing employment openings with the State workforce agency job bank or with the local employment service delivery system where the opening occurs shall satisfy the requirement to list jobs with the appropriate employment service delivery system.

(2) The Contractor shall make the listing of employment openings with the appropriate employment service delivery system at least concurrently with using any other recruitment source or effort and shall involve the normal obligations of placing a bona fide job order, including accepting referrals of veterans and nonveterans. This listing of employment openings does not require hiring any particular job applicant or hiring from any particular group of job applicants and is not intended to relieve the Contractor from any requirements of Executive orders or regulations concerning nondiscrimination in employment.

(3) Whenever the Contractor becomes contractually bound to the listing terms of this clause, it shall advise the State workforce agency in each State where it has establishments of the name and location of each hiring location in the State. As long as the Contractor is contractually bound to these terms and has so advised the State agency, it need not advise the State agency of subsequent contracts. The Contractor may advise the State agency when it is no longer bound by this contract clause.

(d) *Applicability.* This clause does not apply to the listing of employment openings that occur and are filled outside the 50 States, the District of Columbia, Puerto Rico, the Northern Mariana Islands, American Samoa, Guam, the U.S. Virgin Islands, and Wake Island.

(e) *Postings.* (1) The Contractor shall post employment notices in conspicuous places that are available to employees and applicants for employment.

(2) The employment notices shall—

(i) State the rights of applicants and employees as well as the Contractor's obligation under the law to take affirmative action to employ and advance in employment qualified employees and applicants who are disabled veterans, recently separated veterans, Armed Forces service medal veterans, and other protected veterans; and

(ii) Be in a form prescribed by the Director, Office of Federal Contract Compliance Programs, and provided by or through the Contracting Officer.

(3) The Contractor shall ensure that applicants or employees who are disabled veterans are informed of the contents of the notice (e.g., the Contractor may have the notice read to a visually disabled veteran, or may lower the posted notice so that it can be read by a person in a wheelchair).

(4) The Contractor shall notify each labor union or representative of workers with which it has a collective bargaining agreement, or other contract understanding, that the Contractor is bound

by the terms of the Act and is committed to take affirmative action to employ, and advance in employment, qualified disabled veterans, recently separated veterans, other protected veterans, and Armed Forces service medal veterans.

(f) *Noncompliance.* If the Contractor does not comply with the requirements of this clause, the Government may take appropriate actions under the rules, regulations, and relevant orders of the Secretary of Labor. This includes implementing any sanctions imposed on a contractor by the Department of Labor for violations of this clause (52.222–35, Equal Opportunity for Veterans). These sanctions (see 41 CFR 60–300.66) may include—

(1) Withholding progress payments;

(2) Termination or suspension of the contract; or

(3) Debarment of the contractor.

(g) *Subcontracts.* The Contractor shall insert the terms of this clause in subcontracts of $100,000 or more unless exempted by rules, regulations, or orders of the Secretary of Labor. The Contractor shall act as specified by the Director, Office of Federal Contract Compliance Programs, to enforce the terms, including action for noncompliance.

7. Section 5.23 Affirmative Action for Workers with Disabilities (OCT 2010) (FAR 52.222-36).

(a) General. (1) Regarding any position for which the employee or applicant for employment is qualified, the Contractor shall not discriminate against any employee or applicant because of physical or mental disability. The Contractor agrees to take affirmative action to employ, advance in employment, and otherwise treat qualified individuals with disabilities without discrimination based upon their physical or mental disabilities in all employment practices such as -

(i) Recruitment. Advertising, and job application procedures;

(ii) Hiring, upgrading, promotion, award of tenure, demotion, transfer, layoff, termination, right of return from layoff, and rehiring;

(iii) Rates of pay or any other form of compensation and changes in compensation;

(iv) Job assignments, job classifications, organizational structures, position descriptions, lines of progression, and seniority lists;

(v) Leaves of absence, sick leave, or any other leave;

(vi) Fringe benefits available by virtue of employment, whether or not administered by the Contractor;

(vii) Selection and financial support for training, including apprenticeships, professional meetings, conferences, and other related activities, and selection for leaves of absence to pursue training;

(viii) Activities sponsored by the Contractor, including social or recreational programs; and

(ix) Any other term, condition, or privilege of employment.

(2) The Contractor agrees to comply with the rules, regulations, and relevant orders of the Secretary of Labor (Secretary) issued under the Rehabilitation Act of 1973 (29 U.S.C. 793) (the Act), as amended.

(b) *Postings.* (1) The Contractor agrees to post employment notices stating (i) the Contractor's obligation under the law to take affirmative action to employ and advance in employment qualified individuals with disabilities; and (ii) the rights of applicants and employees.

(2) These notices shall be posted in conspicuous places that are available to employees and applicants for employment. The Contractor shall ensure that applicants and employees with

disabilities are informed of the contents of the notice (e.g., the Contractor may have the notice read to a visually disabled individual, or may lower the posted notice so that it might be read by a person in a wheelchair). The notices shall be in a form prescribed by the Deputy Assistant Secretary for Federal Contract Compliance of the U.S. Department of Labor (Deputy Assistant Secretary), and shall be provided by or through the Contracting Officer.

(3) The Contractor shall notify each labor union or representative of workers with which it has a collective bargaining agreement or other contract understanding, that the Contractor is bound by the terms of Section 503 of the Act and is committed to take affirmative action to employ, and advance in employment, qualified individuals with physical or mental disabilities.

(c) *Noncompliance.* If the Contractor does not comply with the requirements of this clause, appropriate actions may be taken under the rules, regulations, and relevant orders of the Secretary issued pursuant to the Act.

(d) *Subcontracts.* The Contractor shall include the terms of this clause in every subcontract or purchase order in excess of $15,000 unless exempted by rules, regulations, or orders of the Secretary. The Contractor shall act as specified by the Deputy Assistant Secretary to enforce the terms, including action for noncompliance.

## 8. Section 5.34 Interest (OCT 2010) (FAR 52.232-17) FEHBAR (JAN 1995).

(a) Except as otherwise provided in this contract under a Price Reduction for Defective Certified Cost or Pricing Data clause or a Cost Accounting Standards clause, all amounts that become payable by the Contractor to the Government under this contract shall bear simple interest from the date due until paid unless paid within 30 days of becoming due. The interest rate shall be the interest rate established by the Secretary of the Treasury as provided in Section 611 of the Contract Disputes Act of 1978 (Public Law 95-563), which is applicable to the period in which the amount becomes due, as provided in paragraph (e) of this clause, and then at the rate applicable for each six-month period as fixed by the Secretary until the amount is paid.

(b) The Government may issue a demand for payment to the Contractor upon finding a debt is due under the contract.

(c) Final Decisions. The Contracting Officer will issue a final decision as required by 33.211 if—

(1) The Contracting Officer and the Contractor are unable to reach agreement on the existence or amount of a debt in a timely manner;

(2) The Contractor fails to liquidate a debt previously demanded by the Contracting Officer within the timeline specified in the demand for payment unless the amounts were not repaid because the Contractor has requested an installment payment agreement; or

(3) The Contractor requests a deferment of collection on a debt previously demanded by the Contracting Officer (see 32.607-2).

(d) If a demand for payment was previously issued for the debt, the demand for payment included in the final decision shall identify the same due date as the original demand for payment.

(e) Amounts shall be due at the earliest of the following dates:

(1) The date fixed under this contract.

(2) The date of the first written demand for payment including any demand resulting from a default termination.

(f) The interest charge shall be computed for the actual number of calendar days involved beginning on the due date and ending on—

(1) The date on which the designated office receives payment from the Contractor;

(2) The date of issuance of a Government check to the Contractor from which an amount otherwise payable has been withheld as a credit against the contract debt; or

(3) The date on which an amount withheld and applied to the contract debt would otherwise have become payable to the Contractor.

(c) The interest charge made under this clause may be reduced under the procedures prescribed in 32.608-2 of the Federal Acquisition Regulation in effect on the date of this contract.

9. Section 5.43 Government Supply Sources (AUG 2010) (FAR 52.251-1).

The Contracting Officer may issue the Contractor an authorization to use Government supply sources in the performance of this contract. Title to all property acquired by the Contractor under such an authorization shall vest in the Government unless otherwise specified in the contract. Such property shall not be considered to be Government-furnished property, as distinguished from Government property. The provisions of the clause entitled ''Government Property,'' at 52.245–1, shall apply to all property acquired under such authorization.

10. Section 5.45 Limitation on Payments to Influence Certain Federal Transactions (OCT 2010) (FAR 52.203-12).

(a) *Definitions*. As used in this clause—

"Agency" means "executive agency" as defined in Federal Acquisition Regulation (FAR) 2.101.

"Covered Federal action" means any of the following actions:

(1) Awarding any Federal contract.

(2) Making any Federal grant.

(3) Making any Federal loan.

(4) Entering into any cooperative agreement.

(5) Extending, continuing, renewing, amending, or modifying any Federal contract, grant, loan, or cooperative agreement.

"Indian tribe" and "tribal organization" have the meaning provided in section 4 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450b) and include Alaskan Natives.

"Influencing or attempting to influence" means making, with the intent to influence, any communication to or appearance before an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any covered Federal action.

"Local government" means a unit of government in a State and, if chartered, established, or otherwise recognized by a State for the performance of a governmental duty, including a local public authority, a special district, an intrastate district, a council of governments, a sponsor group representative organization, and any other instrumentality of a local government.

"Officer or employee of an agency" includes the following individuals who are employed by an agency:

(1) An individual who is appointed to a position in the Government under Title 5, United States Code, including a position under a temporary appointment.

(2) A member of the uniformed services, as defined in subsection 101(3), Title 37, United States Code.

(3) A special Government employee, as defined in section 202, Title 18, United States Code.

(4) An individual who is a member of a Federal advisory committee, as defined by the Federal Advisory Committee Act, Title 5, United States Code, appendix 2.

"Person" means an individual, corporation, company, association, authority, firm, partnership, society, State, and local government, regardless of whether such entity is operated for profit, or not for profit. This term excludes an Indian tribe, tribal organization, or any other Indian organization eligible to receive Federal contracts, grants, cooperative agreements, or loans from an agency, but only with respect to expenditures by such tribe or organization that are made for purposes specified in paragraph (b) of this clause and are permitted by other Federal law.

"Reasonable compensation" means, with respect to a regularly employed officer or employee of any person, compensation that is consistent with the normal compensation for such officer or employee for work that is not furnished to, not funded by, or not furnished in cooperation with the Federal Government.

"Reasonable payment" means, with respect to professional and other technical services, a payment in an amount that is consistent with the amount normally paid for such services in the private sector.

"Recipient" includes the Contractor and all subcontractors. This term excludes an Indian tribe, tribal organization, or any other Indian organization eligible to receive Federal contracts, grants, cooperative agreements, or loans from an agency, but only with respect to expenditures by such tribe or organization that are made for purposes specified in paragraph (b) of this clause and *are* permitted by other Federal law.

"Regularly employed" means, with respect to an officer or employee of a person requesting or receiving a Federal contract, an officer or employee who is employed by such person for at least 130 working days within 1 year immediately preceding the date of the submission that initiates agency consideration of such person for receipt of such contract. An officer or employee who is employed by such person for less than 130 working days within 1 year immediately preceding the date of the submission that initiates agency consideration of such person shall be considered to be regularly employed as soon as he or she is employed by such person for 130 working days.

"State" means a State of the United States, the District of Columbia, or an outlying area of the United States, an agency or instrumentality of a State, and multi-State, regional, or interstate entity having governmental duties and powers.

(b) *Prohibition.* 31 U.S.C. 1352 prohibits a recipient of a Federal contract, grant, loan, or cooperative agreement from using appropriated funds to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any covered Federal actions. In accordance with 31 U.S.C. 1352 the Contractor shall not use appropriated funds to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the award of this contractor the extension, continuation, renewal, amendment, or modification of this contract.

(1) The term *appropriated funds* does not include profit or fee from a covered Federal action.

(2) To the extent the Contractor can demonstrate that the Contractor has sufficient monies, other than Federal appropriated funds, the Government will assume that these other monies were spent for any influencing activities that would be unallowable if paid for with Federal appropriated funds.

(FFS-2012)

(c) *Exceptions.* The prohibition in paragraph (b) of this clause does not apply under the following conditions:

(1) *Agency and legislative liaison by Contractor employees.*

(i) Payment of reasonable compensation made to an officer or employee of the Contractor if the payment is for agency and legislative liaison activities not directly related to this contract. For purposes of this paragraph, providing any information specifically requested by an agency or Congress is permitted at any time.

(ii) Participating with an agency in discussions that are not related to a specific solicitation for any covered Federal action, but that concern—

(A) The qualities and characteristics (including individual demonstrations) of the person's products or services, conditions or terms of sale, and service capabilities; or

(B) The application or adaptation of the person's products or services for an agency's use.

(iii) Providing prior to formal solicitation of any covered Federal action any information not specifically requested but necessary for an agency to make an informed decision about initiation of a covered Federal action;

(iv) Participating in technical discussions regarding the preparation of an unsolicited proposal prior to its official submission; and

(v) Making capability presentations prior to formal solicitation of any covered Federal action by persons seeking awards from an agency pursuant to the provisions of the Small Business Act, as amended by Pub. L. 95-507, and subsequent amendments.

(2) *Professional and technical services.*

(i) A payment of reasonable compensation made to an officer or employee of a person requesting or receiving a covered Federal action or an extension, continuation, renewal, amendment, or modification of a covered Federal action, if payment is for professional or technical services rendered directly in the preparation, submission, or negotiation of any bid, proposal, or application for that Federal action or for meeting requirements imposed by or pursuant to law as a condition for receiving that Federal action.

(ii) Any reasonable payment to a person, other than an officer or employee of a person requesting or receiving a covered Federal action or an extension, continuation, renewal, amendment, or modification of a covered Federal action if the payment is for professional or technical services rendered directly in the preparation, submission, or negotiation of any bid, proposal, or application for that Federal action or for meeting requirements imposed by or pursuant to law as a condition for receiving that Federal action. Persons other than officers or employees of a person requesting or receiving a covered Federal action include consultants and trade associations.

(iii) As used in paragraph (c)(2) of this clause, "professional and technical services" are limited to advice and analysis directly applying any professional or technical discipline (for examples, see FAR 3.803(a)(2)(iii)).

(iv) Requirements imposed by or pursuant to law as a condition for receiving a covered Federal award include those required by law or regulation and any other requirements in the actual award documents.

(3) Only those communications and services expressly authorized by paragraphs (c)(1) and (2) of this clause are permitted.

(d) *Disclosure.*

(1) If the Contractor did not submit OMB Standard Form LLL, Disclosure of Lobbying Activities, with its offer, but registrants under the Lobbying Disclosure Act of 1995 have subsequently made a lobbying contact on behalf of the Contractor with respect to this contract,

the Contractor shall complete and submit OMB Standard Form LLL to provide the name of the lobbying registrants, including the individuals performing the services.

(2) If the Contractor did submit OMB Standard Form LLL disclosure pursuant to paragraph (d) of the provision at FAR 52.203-11, Certification and Disclosure Regarding Payments to Influence Certain Federal Transactions, and a change occurs that affects Block 10 of the OMB Standard Form LLL (name and address of lobbying registrant or individuals performing services), the Contractor shall, at the end of the calendar quarter in which the change occurs, submit to the Contracting Officer within 30 days an updated disclosure using OMB Standard Form LLL.

(e) *Penalties.*

(1) Any person who makes an expenditure prohibited under paragraph (b) of this clause or who fails to file or amend the disclosure to be filed or amended by paragraph (d) of this clause shall be subject to civil penalties as provided for by 31 U.S.C. 1352. An imposition of a civil penalty does not prevent the Government from seeking any other remedy that may be applicable.

(2) Contractors may rely without liability on the representation made by their subcontractors in the certification and disclosure form.

(f) *Cost allowability.* Nothing in this clause makes allowable or reasonable any costs which would otherwise be unallowable or unreasonable. Conversely, costs made specifically unallowable by the requirements in this clause will not be made allowable under any other provision.

(g) *Subcontracts.*

(1) The Contractor shall obtain a declaration, including the certification and disclosure in paragraphs (c) and (d) of the provision at FAR 52.203-11, Certification and Disclosure Regarding Payments to Influence Certain Federal Transactions, from each person requesting or receiving a subcontract exceeding $150,000 under this contract. The Contractor or subcontractor that awards the subcontract shall retain the declaration.

(2) A copy of each subcontractor disclosure form (but not certifications) shall be forwarded from tier to tier until received by the prime Contractor. The prime Contractor shall, at the end of the calendar quarter in which the disclosure form is submitted by the subcontractor, submit to the Contracting Officer within 30 days a copy of all disclosures. Each subcontractor certification shall be retained in the subcontract file of the awarding Contractor.

(3) The Contractor shall include the substance of this clause, including this paragraph (g), in any subcontract exceeding $150,000.


11. Section 5.47 Protecting the Government's Interest When Subcontracting With Contractors Debarred, Suspended or Proposed for Debarment (DEC 2010) (FAR 52.209-6)

(a) *Definition.* Commercially available off-the-shelf (COTS) item, as used in this clause—

(1) Means any item of supply (including construction material) that is—

(i) A commercial item (as defined in paragraph (1) of the definition in FAR 2.101);

(ii) Sold in substantial quantities in the commercial marketplace; and

(iii) Offered to the Government, under a contract or subcontract at any tier, without modification, in the same form in which it is sold in the commercial marketplace; and

(2) Does not include bulk cargo, as defined in section 3 of the Shipping Act of 1984 (46 U.S.C. App. 1702), such as agricultural products and petroleum products.

(b) The Government suspends or debars Contractors to protect the Government's interests. Other than a subcontract for a commercially available off-the-shelf item, the Contractor

shall not enter into any subcontract, in excess of $30,000 with a Contractor that is debarred, suspended, or proposed for debarment by any executive agency unless there is a compelling reason to do so.

(c) The Contractor shall require each proposed subcontractor whose subcontract will exceed $30,000, other than a subcontractor providing a commercially available off-the-shelf item, to disclose to the Contractor, in writing, whether as of the time of award of the subcontract, the subcontractor, or its principals, is or is not debarred, suspended, or proposed for debarment by the Federal Government.

(d) A corporate officer or a designee of the Contractor shall notify the Contracting Officer, in writing, before entering into a subcontract with a party (other than a subcontractor providing a commercially available off-the-shelf item) that is debarred, suspended, or proposed for debarment (see FAR 9.404 for information on the Excluded Parties List System). The notice must include the following:

(1) The name of the subcontractor.

(2) The Contractor's knowledge of the reasons for the subcontractor being in the Excluded Parties List System.

(3) The compelling reason(s) for doing business with the subcontractor notwithstanding its inclusion in the Excluded Parties List System.

(4) The systems and procedures the Contractor has established to ensure that it is fully protecting the Government's interests when dealing with such subcontractor in view of the specific basis for the party's debarment, suspension, or proposed debarment.

(e) *Subcontracts.* Unless this is a contract for the acquisition of commercial items, the Contractor shall include the requirements of this clause, including this paragraph (e) (appropriately modified for the identification of the parties), in each subcontract that—

(1) Exceeds $30,000 in value; and

(2) Is not a subcontract for commercially available off-the-shelf items.

12. Section 5.51 Pension Adjustments and Asset Reversions (OCT 2010) (FAR 52.215-15).

(a) The Contractor shall promptly notify the Contracting Officer in writing when it determines that it will terminate a defined benefit pension plan or otherwise recapture such pension fund assets.

(b) For segment closings, pension plan terminations, or curtailment of benefits, the amount of the adjustment shall be-

(1) For contracts and subcontracts that are subject to full coverage under the Cost Accounting Standards (CAS) Board rules and regulations (48 CFR Chapter 99), the amount measured, assigned, and allocated in accordance with 48 CFR 9904.413-50(c)(12); and

(2) For contracts and subcontracts that are not subject to full coverage under the CAS, the amount measured, assigned, and allocated in accordance with 48 CFR 9904.413-50(c)(12), except the numerator of the fraction at 48 CFR 9904.413-50(c)(12)(vi) shall be the sum of the pension plan costs allocated to all non-CAS-covered contracts and subcontracts that are subject to Federal Acquisition Regulation (FAR) Subpart 31.2 or for which certified cost or pricing data were submitted.

(c) For all other situations where assets revert to the Contractor, or such assets are constructively received by it for any reason, the Contractor shall, at the Government's option, make a refund or give a credit to the Government for its equitable share of the gross amount withdrawn. The Government's equitable share shall reflect the Government's participation in

pension costs through those contracts for which certified cost or pricing data were submitted or that are subject to FAR Subpart 31.2.

(d) The Contractor shall include the substance of this clause in all subcontracts under this contract that meet the applicability requirement of FAR 15.408(g).

13. Section 5.55 Employment Reports on Veterans (SEP 2010) (FAR 52.222-37).

(a) *Definitions.* As used in this clause, "Armed Forces service medal veteran," "disabled veteran," "other protected veteran," and "recently separated veteran," have the meanings given in the Equal Opportunity for Veterans clause 52.222–35.

(b) Unless the Contractor is a State or local government agency, the Contractor shall report at least annually, as required by the Secretary of Labor, on—

(1) The total number of employees in the contractor's workforce, by job category and hiring location, who are disabled veterans, other protected veterans, Armed Forces service medal veterans, and recently separated veterans.

(2) The total number of new employees hired during the period covered by the report, and of the total, the number of disabled veterans, other protected veterans, Armed Forces service medal veterans, and recently separated veterans; and

(3) The maximum number and minimum number of employees of the Contractor or subcontractor at each hiring location during the period covered by the report.

(c) The Contractor shall report the above items by completing the Form VETS–100A, entitled "Federal Contractor Veterans' Employment Report (VETS–100A Report)."

(d) The Contractor shall submit VETS– 100A Reports no later than September 30 of each year.

(e) The employment activity report required by paragraphs (b)(2) and (b)(3) of this clause shall reflect total new hires, and maximum and minimum number of employees, during the most recent 12-month period preceding the ending date selected for the report. Contractors may select an ending date—

(1) As of the end of any pay period between July 1 and August 31 of the year the report is due; or

(2) As of December 31, if the Contractor has prior written approval from the Equal Employment Opportunity Commission to do so for purposes of submitting the Employer Information Report EEO–1 (Standard Form 100).

(f) The number of veterans reported must be based on data known to the contractor when completing the VETS–100A. The contractor's knowledge of veterans status may be obtained in a variety of ways, including an invitation to applicants to self-identify (in accordance with 41 CFR 60–300.42), voluntary self-disclosure by employees, or actual knowledge of veteran status by the contractor. This paragraph does not relieve an employer of liability for discrimination under 38 U.S.C. 4212.

(g) The Contractor shall insert the terms of this clause in subcontracts of $100,000 or more unless exempted by rules, regulations, or orders of the Secretary of Labor.

14. Section 5.60 Subcontracts for Commercial Items (DEC 2010) (FAR 52.244-6).

(a) *Definitions.* As used in this clause—

"Commercial item" has the meaning contained in Federal Acquisition Regulation 2.101, Definitions.

"Subcontract" includes a transfer of commercial items between divisions, subsidiaries, or affiliates of the Contractor or subcontractor at any tier.

(b) To the maximum extent practicable, the Contractor shall incorporate, and require its subcontractors at all tiers to incorporate, commercial items or nondevelopmental items as components of items to be supplied under this contract.

(c)(1) The Contractor shall insert the following clauses in subcontracts for commercial items:

(i) 52.203-13, Contractor Code of Business Ethics and Conduct (APR 2010) (Pub. L. 110-252, Title VI, Chapter 1 (41 U.S.C. 251 note), if the subcontract exceeds $5,000,000 and has a performance period of more than 120 days. In altering this clause to identify the appropriate parties, all disclosures of violation of the civil False Claims Act or of Federal criminal law shall be directed to the agency Office of the Inspector General, with a copy to the Contracting Officer.

(ii) 52.203-15, Whistleblower Protections Under the American Recovery and Reinvestment Act of 2009 (JUN 2010) (Section 1553 of Pub. L. 111-5), if the subcontract is funded under the Recovery Act.

(iii) 52.219-8, Utilization of Small Business Concerns (DEC 2010) (15 U.S.C. 637(d)(2) and (3)), if the subcontract offers further subcontracting opportunities. If the subcontract (except subcontracts to small business concerns) exceeds $650,000 ($1.5 million for construction of any public facility), the subcontractor must include 52.219-8 in lower tier subcontracts that offer subcontracting opportunities.

(iv) 52.222-26, Equal Opportunity (Mar 2007) (E.O. 11246).

(v) 52.222–35, Equal Opportunity for Veterans (SEP 2010) (38 U.S.C. 4212(a))

(vi) 52.222-36, Affirmative Action for Workers with Disabilities (OCT 2010) (29 U.S.C. 793).

(vii) 52.222–40, Notification of Employee Rights Under the National Labor Relations Act (Dec 2010) (E.O. 13496), if flow down is required in accordance with paragraph (f) of FAR clause 52.222–40.

(viii) [Reserved]

(ix) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006) (46 U.S.C. App. 1241 and 10 U.S.C. 2631), if flow down is required in accordance with paragraph (d) of FAR clause 52.247-64).

(2) While not required, the Contractor may flow down to subcontracts for commercial items a minimal number of additional clauses necessary to satisfy its contractual obligations.

(d) The Contractor shall include the terms of this clause, including this paragraph (d), in subcontracts awarded under this contract.


15. Section 5.61 Notification of Employee Rights Under National Labor Relations Act (DEC 2010).


(a) During the term of this contract, the Contractor shall post an employee notice, of such size and in such form, and containing such content as prescribed by the Secretary of Labor, in conspicuous places in and about its plants and offices where employees covered by the National Labor Relations Act engage in activities relating to the performance of the contract, including all places where notices to employees are customarily posted both physically and electronically, in the languages employees speak, in accordance with 29 CFR 471.2(d) and (f).

(1) Physical posting of the employee notice shall be in conspicuous places in and about the Contractor's plants and offices so that the notice is prominent and readily seen by employees who are covered by the National Labor Relations Act and engage in activities related to the performance of the contract.

(2) If the Contractor customarily posts notices to employees electronically, then the Contractor shall also post the required notice electronically by displaying prominently, on any Web site that is maintained by the Contractor and is customarily used for notices to employees about terms and conditions of employment, a link to the Department of Labor's Web site that contains the full text of the poster. The link to the Department's Web site, as referenced in (b)(3) of this section, must read, ''Important Notice about Employee Rights to Organize and Bargain Collectively with Their Employers.''

(b) This required employee notice, printed by the Department of Labor, may be—

(1) Obtained from the Division of Interpretations and Standards, Office of Labor-Management Standards, U.S. Department of Labor, 200 Constitution Avenue, NW., Room N–5609, Washington, DC 20210, (202) 693–0123, or from any field office of the Office of Labor-Management Standards or Office of Federal Contract Compliance Programs;

(2) Provided by the Federal contracting agency if requested;

(3) Downloaded from the Office of Labor-Management Standards Web site at http://www.dol.gov/olms/regs/compliance/EO13496.htm; or

(4) Reproduced and used as exact duplicate copies of the Department of Labor's official poster.

(c) The required text of the employee notice referred to in this clause is located at Appendix A, Subpart A, 29 CFR Part 471.

(d) The Contractor shall comply with all provisions of the employee notice and related rules, regulations, and orders of the Secretary of Labor.

(e) In the event that the Contractor does not comply with the requirements set forth in paragraphs (a) through (d) of this clause, this contract may be terminated or suspended in whole or in part, and the Contractor may be suspended or debarred in accordance with 29 CFR 471.14 and subpart 9.4. Such other sanctions or remedies may be imposed as are provided by 29 CFR part 471, which implements Executive Order 13496 or as otherwise provided by law.

(f) Subcontracts.

(1) The Contractor shall include the substance of this clause, including this paragraph (f), in every subcontract that exceeds $10,000 and will be performed wholly or partially in the United States, unless exempted by the rules, regulations, or orders of the Secretary of Labor issued pursuant to section 3 of Executive Order 13496 of January 30, 2009, so that such provisions will be binding upon each subcontractor.

(2) The Contractor shall not procure supplies or services in a way designed to avoid the applicability of Executive Order 13496 or this clause.

(3) The Contractor shall take such action with respect to any such subcontract as may be directed by the Secretary of Labor as a means of enforcing such provisions, including the imposition of sanctions for noncompliance.

(4) However, if the Contractor becomes involved in litigation with a subcontractor, or is threatened with such involvement, as a result of such direction, the Contractor may request the United States, through the Secretary of Labor, to enter into such litigation to protect the interests of the United States.

16.  Section 5.66 Updates of Publically Available Information Regarding Responsibility Matters (JAN 2011) (FAR 52.209-9).

(a) The Contractor shall update the information in the Federal Awardee Performance and Integrity Information System (FAPIIS) on a semi-annual basis, throughout the life of the

contract, by posting the required information in the Central Contractor Registration database at http://www.ccr.gov.

(b)(1) The Contractor will receive notification when the Government posts new information to the Contractor's record.

(2) The Contractor will have an opportunity to post comments regarding information that has been posted by the Government. The comments will be retained as long as the associated information is retained, i.e., for a total period of 6 years. Contractor comments will remain a part of the record unless the Contractor revises them.

(3)(i) Public requests for system information posted prior to April 15, 2011, will be handled under Freedom of Information Act procedures, including, where appropriate, procedures promulgated under E.O. 12600.

(ii) As required by section 3010 of Public Law 111–212, all information posted in FAPIIS on or after April 15, 2011, except past performance reviews, will be publicly available.

17. <u>Section 5.67 Personal Identity Verification of Contractor Personnel (JAN 2011) (FAR 52.204-9).</u>

(a) The Contractor shall comply with agency personal identity verification procedures identified in the contract that implement Homeland Security Presidential Directive-12 (HSPD-12), Office of Management and Budget (OMB) guidance M-05-24 and Federal Information Processing Standards Publication (FIPS PUB) Number 201.

(b) The Contractor shall account for all forms of Government-provided identification issued to the Contractor employees in connection with performance under this contract. The Contractor shall return such identification to the issuing agency at the earliest of any of the following, unless otherwise determined by the Government:

(1) When no longer needed for contract performance.

(2) Upon completion of the Contractor employee's employment.

(3) Upon contract completion or termination.

(c) The Contracting Officer may delay final payment under a contract if the Contractor fails to comply with these requirements.

(d) The Contractor shall insert the substance of this clause, including this paragraph (d), in all subcontracts when the subcontractor's employees are required to have routine physical access to a Federally-controlled facility and/or routine access to a Federally-controlled information system. It shall be the responsibility of the prime Contractor to return such identification to the issuing agency in accordance with the terms set forth in paragraph (b) of this section, unless otherwise approved in writing by the Contracting Officer.

Part IV-SPECIAL PROVISIONS is deleted and replaced with the following:

SECTION 4.1
ALTERATIONS IN CONTRACT (JAN 2011) (FAR 52.252-4)

Portions of this contract are altered as follows:

(a) Section 1.6 Confidentiality of Records. The following subsection is added:

(d) Local Blue Cross and/or Blue Shield Plans may combine the personal data and medical records of Federal subscribers, and information relating thereto, with the same information of other individuals who have health benefits coverage under the Local Blue Cross and/or Blue Shield Plan. This combined data may only be used and disclosed for the Plan's health care operations and payment activities, as such terms and conditions are defined under the Health Insurance Portability and Accountability Act, and its implementing regulations (45 CFR § 164.501). Such activities include, but are not limited to: care management; prevention, detection, and recovery of funds subject to fraud and abuse; and negotiation of provider contracts.

(e) As used in subsection (b)(1) of this section, "administration of this contract" means health care operations and payment activities, as such terms and conditions are defined under the Health Insurance Portability and Accountability Act, and its implementing regulations (45 CFR § 164.501).

(b) Section 1.9 Plan Performance—Experience-Rated FFS Contracts.

The Carrier may use the appropriate systems for measurement and/or collection of data on the quality of the health care services as described in subparagraph 1.9(b).

(c) Section 1.14, Misleading, Deceptive, or Unfair Advertising, is amended by removing the reference to the NAIC Advertisements of Accident and Sickness Insurance Model Regulation (Appendix D-b). Carrier should continue to use the FEHB Supplemental Literature Guidelines (now at the renumbered Appendix C) along with FEHBAR 1603.7002.

(d) Section 1.15 Renewal and Withdrawal of Approval (FEHBAR). The following subsections are added:

(d) If the agency suspends payment of the subscription charges for any reason, the Carrier may (1) suspend making benefit payments until payment of all subscription charges due is fully restored; or (2) terminate the contract without prior notice.

(e) Section 1.21 Patient Bill of Rights. For the purpose of compliance with this Section, the Carrier will conduct the following minimum activities: (1) the Carrier will provide subscribers with a Fact Sheet that includes information about the disenrollment rate in the Blue Cross and Blue Shield Service Benefit Plan, as well as Local Plan-specific information including compliance with Federal and State financial requirements, public corporate information, years in existence, and accreditation status; (2) Provider

Directories will include language advising subscribers to contact their providers directly to obtain information about the providers, including but not limited to board certifications, languages spoken, availability of interpreters, facility accessibility, and whether the provider is accepting new patients.

(f) Section 1.30 Health Information Technology Privacy and Security. Subsections (b) and (c) of Section 1.30 are amended to read as follows:

(b) The Carrier will promote consumer transparency by ensuring that at the point where the Federal member enters the subcontractor's, large provider's, or vendor's website or web portal the link to the subcontractor's, large provider's, or vendor's notice of privacy practices and/or privacy policies is displayed on the bottom, or prominently displayed elsewhere, on the website or web portal.

(c) Notice of privacy practices and/or privacy policies disclosures must describe the uses of individually identifiable protected health information and any potential disclosure to other entities as described in the HIPAA Privacy Rule.

(g) Section 2.2 Benefits Provided. The following paragraph is added to subsection 2.2(a):

(4) The Carrier may pay the Preferred Provider Organization level of benefits under this contract to ease the hardship of members affected by natural disasters such as earthquakes, floods, etc., when because of the natural disaster members have difficulty gaining access to Preferred network providers. The Carrier may pay the Preferred level of benefits without regard to the provider's contractual relationship with the Carrier and will determine an appropriate time frame based on local conditions during which the provision of this paragraph will apply. Benefits provided under this paragraph will be made available to all members similarly affected by the natural disaster.

(h) Section 2.3 Payment of Benefits and Provision of Services and Supplies. Notwithstanding subsection (f) of Section 2.3, benefits provided under the contract are not assignable by the Member to any person without express written approval of the carrier, and in the absence of such approval, any such assignment shall be void. Notwithstanding such approval, no assignment of benefits may be made in any case prior to the time that a valid claim for benefits arises.

(i) Section 2.3 Payment of Benefits and Provision of Services and Supplies. The introductory paragraph of Subsection 2.3(g) is amended to read as follows:

(g) *Erroneous Payments.*
(i) If the Carrier or OPM determines that a Member's claim has been paid in error for any reason (except in the case of fraud or abuse), the Carrier shall make a prompt and diligent effort to recover the erroneous payment to the member from the member or, if to the provider, from the provider; the recovery of any overpayment must be treated as an erroneous benefit payment, overpayment, or duplicate payment under 48 C.F.R. 1631.201-70(h) regardless of any time period limitations in the written agreement with the provider.

(ii) The Carrier shall be deemed to have satisfied the requirements of

Subsection (g) (i) above by complying with Subsections (ii), (iii), and (iv). Local Blue Cross and Blue Shield Plans which have time period limitations in their provider contracts which prevent the Plan from recovering erroneous benefit payments made to providers will participate in an action plan. The action plan shall be developed by the Blue Cross and Blue Shield Association by December 31, 2008 and agreed to by the Contracting Officer and the Blue Cross and Blue Shield Association. The Blue Cross and Blue Shield Association and the Contracting Officer shall utilize standards of commercial reasonableness and neither shall unreasonably withhold agreement. The action plan shall be designed to reduce the occurrence of erroneous benefit payments, to identify and recover erroneous benefit payments within the time limits stipulated in their provider contracts, and to demonstrate due diligence in making an attempt to identify and recover within that provider contract timeframe such erroneous benefit payments.

(iii) The Blue Cross and Blue Shield Association shall be responsible for monitoring and determining whether each Blue Cross and Blue Shield Plan participating in the action plan is complying with its obligations under the action plan.

(iv) A Blue Cross and Blue Shield Plan which is in compliance with its obligations under the action plan shall be found to be in compliance with its obligation under this Section 2.3(g) to make a prompt and diligent effort to recover erroneous benefit payments. In the event that any Plan with such time period limitations is determined to be not in substantial compliance with the action plan, and that Plan is determined not to have pursued material benefit payments with promptness and diligence, then the Plan shall return the erroneous benefit payments to the Program.

(v) The Carrier shall follow general business practices and procedures in collecting debts owed under the Federal Employees Health Benefits Program. Prompt and diligent effort to recover erroneous payments means that upon discovering that an erroneous payment exists, the Carrier shall—

(j) Section 2.3 Payment of Benefits and Provision of Services and Supplies. Subsection (g)(7)(ii) of Section 2.3 is amended to read as follows:

Notwithstanding (g)(7)(i), the Carrier may not charge the contract for the administrative costs to correct erroneous benefit payments (or to correct processes or procedures that caused erroneous benefit payments) when the errors are egregious and repeated. These costs are deemed to be unreasonable and unallowable under Section 3.2(b). The term "repeated" in the previous sentence does not apply to situations in which a claims processing system error causes multiple erroneous payments or to situations that involve audit findings on errors that are endemic to the provision of insurance and claims processing.

(k) Section 2.3 Payment of Benefits and Provision of Services and Supplies. Subsection (g)(10) of Section 2.3 is amended to read as follows:

(10) In compliance with the Contracts Disputes Act, the Carrier shall return to the

Program an amount equal to the uncollected erroneous benefit payment where the Contracting Officer determines that the Carrier failed to make a prompt and diligent effort, as that term is described above, to recover the erroneous benefit payment. This provision applies to benefit payments which have been paid in error for any reason (except in the case of fraud or abuse).

(l) Section 2.4 Termination of Coverage and Conversion Privileges. The conversion contract set forth in Section 2.4(c) may be a contract that is regularly offered by the local Blue Cross and/or Blue Shield Plan.

(m) Section 2.5 Subrogation. The following subsections are added:

(c) To the extent that a Member has received benefits for covered services under this contract for an injury or illness caused by a third party, the Carrier shall have the right to be subrogated and succeed to any rights of recovery against any person or organization from whom the Member is legally entitled to receive all or part of those same benefits, including insurers of individuals (non-group) policies of liability insurance that are issued to and in the name of the Member. The obligation of the Carrier to recover amounts through subrogation is limited to making a reasonable effort to seek recovery of amounts to which it is entitled to recover in cases which are brought to its attention. The Carrier shall not be required to recover any amounts from any person or organization who causes an injury or illness for which the Member makes claims for benefits.

(d) The Carrier may also recover directly from the Member all amounts received by the Member by suit, settlement, or otherwise from any third party or its insurer, or the Member's insurer under an individual policy or liability insurance, for benefits which have also been paid under this contract.

(e) The Member shall take such action, furnish such information and assistance, and execute such papers as the Carrier or its representative believes are necessary to facilitate enforcement of its rights, and shall take no action which would prejudice the interests of the Carrier to subrogation.

(f) Effective January 1, 1997, all Participating Plans shall subrogate under a single, nation-wide policy to ensure equitable and consistent treatment for all Members under the contract.

(n) Section 2.6 Coordination of Benefits (FEHBAR). The following subsections are added:

(g) The benefits payable by this Plan shall be determined, on a claim by claim basis, only for those claims in excess of $100, except where Medicare is the primary payer of benefits.

(h) Whenever payments which should have been made under this contract in accordance with this provision have been made under any other group health coverage, the Carrier shall have the right, exercisable alone and in its sole discretion, to pay over to any organizations making such other payments any amount it shall determine to be

warranted in order to satisfy the intent of this provision, and amounts so paid shall be deemed to be benefits paid under this contract and, to the extent of such payments discharged from liability under the contract.

(o) Section 3.1 Payments (FEHBAR). The following sentence is added to the end of Section 3.1(a):

OPM will withhold from the subscription charges amounts for other obligations due under the contract only to the extent that OPM and the Carrier have agreed in writing to specific deductions for such other obligations.

(p) Section 3.1 Payments (FEHBAR). The following subsection is added:

(g) Except as required pursuant to Sections 1.25 and 2.12, in the event this contract is terminated or not renewed, the agency shall be liable for all sums due and unpaid, including subscription charges, for the period up to the last day of the Member's entitlement to benefits.

(q) Section 3.2 Accounting and Allowable Cost (FEHBAR). Section 3.2(b)(2)(ii) of this contract is amended to comply with 5 U.S.C. 8909(f) as follows:

(1) No tax, fee, or other monetary payment may be imposed, directly or indirectly, on a Carrier or an underwriting or plan administration subcontractor of an approved health benefits plan by any State, the District of Columbia, or the Commonwealth of Puerto Rico, or by any political subdivision or other governmental authority thereof, with respect to any payment made from the Fund.

(2) Paragraph (1) shall not be construed to exempt any Carrier or subcontractor of an approved health benefits plan from the imposition, payment, or collection of a tax, fee, or other monetary payment on the net income or profit accruing to or realized by such Carrier or underwriting or plan administration subcontractor from business conducted under this Chapter, if that tax, fee, or payment is applicable to a broad range of business activity.

(r) Section 3.2 Accounting and Allowable Cost (FEHBAR). The provision in Section 3.2 (b)(2)(iv)(A) is supplemented as follows:

Charges for mandatory statutory reserves (Section 3.2(b)(2)(iv)(A)) to satisfy mandatory statutory reserve requirements of Participating Plans are allowable to the extent that such requirements exceed that portion of the service charge at Appendix B, Subscription Rates, Charges, Allowances and Limitations applicable to such Plans.

(s) Section 3.2 Accounting and Allowable Cost (FEHBAR). This section is modified as follows:

The Carrier, as required by the Blue Cross and Blue Shield Service Benefit Plan Workplan, shall furnish OPM an accounting of its operations under the contract not less than 120 days after the end of the calendar year contract period.

(t) Section 3.3 Special Reserve. The provision in Section 3.3(a) is supplemented as follows:

The Special reserve held by or on behalf of the Carrier is to be used only for payment of charges against this contract, including advance payments to Participating Plans and to hospitals.

(u) Section 3.10, Audit, Financial, and Other Information. Compliance by the Carrier and Participating Blue Cross and Blue Shield Plans with the Blue Cross Blue Shield Service Benefit Plan Workplan, as agreed upon between the Carrier and OPM, will constitute compliance with the Audit Guide referred to in Sections 3.2 and 3.10.

SECTION 4.2
HOSPITAL (FACILITY) BENEFIT PAYMENTS AND CONDITIONS (JAN 1991)

(a) Benefits described in the agreed upon brochure text shall be provided to the extent practicable in the form of services rendered by hospitals, freestanding ambulatory facilities, and home health care agencies, and payment, therefore, by or on behalf of the carrier shall constitute a complete discharge of their obligations under this contract to the extent of services rendered in accordance with the terms and conditions of the contract.

(b) Benefits for inpatient hospital care shall be available only to a Member admitted to the hospital on the recommendation, and while under the active medical supervision of a duly licensed physician or alternative provider as described in section 8902(k)(1) of title 5 U.S.C. who is a member of the staff of, or acceptable to, the hospital selected.

(c) Hospital service is subject to all the rules and regulations of the hospital selected including rules governing admissions.

(d) While a Member may elect to be hospitalized in any hospital, the Carrier does not undertake to guarantee the admission of such Member to the hospital, nor the availability of any accommodations or services therein requested by the Member or his physician.

SECTION 4.3
DEFINITION OF CARRIER (JAN 1991)

The Carrier is the Blue Cross and Blue Shield Association, an Illinois not-for-profit corporation, acting on behalf of participating Blue Cross and Blue Shield Plans and pursuant to authority specified in Exhibit A for and in behalf of the organizations specified in Exhibit A (hereinafter sometimes referred to as "Participating Plans").

SECTION 4.4
AUDIT DISPUTES (JAN 2000)

(a) Any questioned costs or issues documented by or on behalf of OPM's Office of the Inspector General (OIG) in draft or final audit reports examining the Carrier's and Participating Plans' performance under this contract, that are provided to the Carrier and that were initially raised in the timeframe set forth in subsection (c) below, remain open until resolved. Audit issues related to monetary findings for which extensions of the

waiver period for the issuance of final decisions and processing of prior period adjustments were obtained in previous contract terms also remain open until resolved.

(b) Resolution of a questioned cost or issue can be the result of a resolution letter or the issuance of a final decision by the Contracting Officer, or by the processing of a prior period adjustment, an adjustment to the Special reserve, or submission of a claim to OPM (as appropriate) by the Carrier or Participating Plan. A prior period adjustment intended to partially or fully resolve an audit finding will not be considered closed until properly reported on the calendar year Annual Accounting Statement.

(c) A claim seeking, as a matter of right, the payment of money, in a sum certain, pursuant to 48 CFR section 52.233-1, shall not be made more than five years following the last day prescribed by the contract for filing the calendar year Annual Accounting Statement for the year with respect to which the claim arises. A claim includes, in the case of the carrier, a charge against the contract.

SECTION 4.5
ASSOCIATION DUES (JAN 2004)

A Participating local Blue Cross and Blue Shield Plan may charge to this contract Association Dues, with the exception of dues related to those lobbying costs and Special Assessments determined to be unallowable. In calculating the unallowable portion of dues related to lobbying costs for a contract year, the Blue Cross and Blue Shield Plan will rely on the percentage of dues, less any special assessments, as determined by the BCBSA for IRS purposes, to be not tax deductible from the previous contract year.

SECTION 4.6
TRAVEL COSTS (JAN 1996)

The Carrier may charge and account for travel expenses related to administration of the contract on a per diem basis, subject to the maximums prescribed by the Federal Travel Regulations. For those travel costs for each contract term that are subject to the Federal per diem rates set forth at 48 CFR section 31.205-46, the Carrier shall charge to the contract an amount equal to the lesser of:

(i) the actual aggregate charges for those costs, or
(ii) the aggregate charges calculated using the per diem rates set forth in the Federal Travel Regulations.

SECTION 4.7
MARKET RESEARCH COSTS (JAN 1996)

(a) Costs of market research surveys or studies are generally allowable if the survey or study is:

1. directed to current Members and Members who left the Blue Cross and Blue Shield Service Benefit Plan in the most recent Open season, or
2. focused on long-range planning, industry state-of-the-art developments, or product development issues for which a direct benefit or potential benefit to the FEHB Program

can be identified, or
3. pre-approved by the Contracting Officer.

(b) Costs of market research surveys or studies are generally not allowable if the primary purpose is to survey or study an otherwise unallowable cost item, such as: to determine the effectiveness of advertising or sales strategies; to evaluate image effectiveness or ways to achieve image enhancement; or to perform a competitive analysis with other carriers in the FEHB Program. Such costs are unallowable, regardless of who receives the research surveys or studies.

(c) This provision does not supersede other contract requirements, such as prior approval for subcontracts under Section 1.16 Subcontracts (FEHBAR 1652.244-70).

SECTION 4.8
PRESCRIPTION DRUG BENEFITS WAIVER PROVISIONS (JAN 2009)

(a) For the purposes of applying the special provisions in this section, the Standard Option Mail Service Prescription Drug Program service standards are:
    (1) When a prescription order is placed that does not require additional information or clarification (i.e., a clean or non-diverted prescription), the prescription order shall be dispensed within three business days from the date of receipt so the enrollee may expect to receive the medication within 7 calendar days.

    (2) When a prescription order is placed that does require additional information, clarification or resolution of payment issues (i.e., a diverted prescription), the prescription order shall be dispensed within seven business days from the date of receipt so the enrollee may expect to receive the medication within 14 calendar days. However the following situations will not be considered a diverted prescription for the purposes of this section:
    (i) Prescriptions for refrigerated products that require prior arrangements between the mail order pharmacy and a Member before the Member can receive the Prescription;
    (ii) Prescriptions requiring specific counseling obligations imposed by the pharmaceutical manufacturer, distributor or the FDA;
    (iii) Prescriptions requiring "registration" with a pharmaceutical manufacturer.

(b) The special provisions described in paragraphs (c)(1), (2), and (3) shall become effective automatically when less than 98 percent of the prescriptions are filled within the service standards described in either paragraph (a)(1) or (a)(2) for 7 consecutive business days. The special provisions shall terminate when for 7 consecutive business days 98 percent or more of the prescriptions are filled within the service standards described in paragraphs (a)(1) and (a)(2) of this section.

(c) The special provisions are:
    (1) The Carrier shall waive during the effective periods in paragraph (b) the coinsurance for a 21 day prescription filled at a Preferred retail pharmacy when the Mail Service Prescription Drug Program vendor is unable to fill the prescription within the service standards. This waiver of the coinsurance shall be in effect for 14 calendar days after notice to the enrollee as described in paragraph (c)(2) below.

(2) The Carrier shall deliver to the enrollee a written or telephone notice no later than 5 days from the date of receipt for clean or non-diverted prescriptions and no later than 12 days from the date of receipt for diverted prescriptions.
This notice shall:

(i) advise the enrollee that the Mail Service Prescription Drug Program may not be able to fill the prescription(s) within the service standard timeframes;

(ii) advise the enrollee that any applicable coinsurance will be waived for a 21 day supply of the medication(s) when filled at a Preferred retail pharmacy;

(iii) provide the enrollee with instructions on how to use the waiver, and

(iv) advise the enrollee when the waiver will expire.

(3) The Carrier may use next day delivery service at no additional cost to the enrollee in order to meet the service standards in (a)(1) and (a)(2).

SECTION 4.9
SMALL BUSINESS SUBCONTRACTING PLAN (JAN 2002) (FAR 52.219-9) (AS AMENDED)

An amended clause 52.219-9, Small Business Subcontracting Plan, is attached to Appendix E.

SECTION 4.10
LETTER OF CREDIT (JAN 1997)

As of January 1, 1997, OPM will administer Letter of Credit drawdowns directly with the local Plans.

SECTION 4.11
PILOTING OF COST CONTAINMENT PROGRAMS (JAN 2001)

Upon approval by the Contracting Officer, the Carrier may design and implement pilot programs in one or more local Plan areas that test the feasibility and examine the impact of various managed care initiatives. The Carrier shall brief the Contracting Officer on a pilot program prior to its implementation, advise the Contracting Officer of the progress of the pilot program and provide a written evaluation at the conclusion of the pilot program. The evaluation of the pilot program shall, at a minimum, assess the cost effectiveness, effect on quality of care and/or quality of life, and customer satisfaction, and recommend whether the pilot program should be continued or expanded.

SECTION 4.12
TRANSITION COSTS FOR PLAN TERMINATIONS (JAN 1999)

In the event a Participating Plan's license to use the Blue Cross and/or Blue Shield service marks is terminated, thereby rendering it ineligible to participate in this Contract, the costs of transitioning the terminated Plan's Service Benefit Plan subscribers to a successor Plan shall be subject to advance approval. The Carrier shall submit to OPM a proposed transition plan, together with a detailed estimate of costs, prior to the incurrence of any significant transition costs. OPM and the Carrier shall negotiate an advance agreement pursuant to FAR 31.109 that covers the extent of allowable transition costs.

SECTION 4.13
PAYMENT BY ELECTRONIC FUNDS TRANSFER-CENTRAL CONTRACTOR
REGISTRATION (MAY 1999) (FAR 52.232-33)

The references to the Central Contractor Registration in FAR 52.232-33 are not
applicable to this contract.

*APPENDIX A*



**ATTACH**



**2012 FEHB BROCHURE**

# APPENDIX B

## SUBSCRIPTION RATES, CHARGES, ALLOWANCES AND LIMITATIONS

Fee-For-Service Carrier

Blue Cross and Blue Shield Association
CONTRACT NO. CS 1039
Effective January 1, 2012

(a)  Biweekly net-to-carrier rates, with appropriate adjustments for Enrollees paid on other than a biweekly basis, are as follows:

| Standard Option | | Basic Option | |
|---|---|---|---|
| Self Only | $260.89 | Self | $216.37 |
| Self and Family | $589.26 | Self and Family | $506.67 |

(b) The amount of administrative expenses and charges to be included in the Annual Accounting Statement required by Section 3.2 shall be as set out in the schedule below:

| Item | Amount |
|---|---|
| (i)  Administrative Expenses | Actual, but not to exceed the Contractual Expense Limitation for 2012,* plus an amount sufficient to cover the costs needed to pay the Plan's Independent Public Accountant to undertake the audits and agreed upon procedures required in the "FEHBP Experienced-Rated Carrier and Service Organization Audit Guide." |
| (ii) Taxes | Actual (except that premium taxes as defined are not allowable). |
| (iii)  Service Charge | 0.64% of estimated and incurred claims and allowable administrative expenses or $185,000,000.00. |

(c) Administrative Cost Limit for the 2012 Plan year is $1,261,342,000.00.

## APPENDIX G

## KEY PERSONNEL

List of Carrier Key Personnel - as indicated in Section 1.36 Carrier's Key Personnel.

(FFS-2012)

# BLUE CROSS AND BLUE SHIELD ASSOCIATION

# FEDERAL EMPLOYEE PROGRAM

# BCBS PLAN SUBCONTRACTING PLAN
**(FISCAL YEAR 2012)**


Carrier:                                  Blue Cross and Blue Shield Association
                                          Federal Employee Program

Address:                                  1310 G. Street N. W.
                                          Washington, D. C. 20005

Total Amount of Contract:                 $23,000,000,000.00 (Est.)

Period of Contract Performance (DAY, MO. & YR.)
                    1 January, 2012 through 31 December, 2012

Period of **this Small Business Subcontracting Plan** – (DAY, Mo. & YR.)
                    1 October, 2011 through 30 September 2012

1.    Type of Plan

This is a small business subcontracting plan (SADBUS Plan) providing estimates of small business contracting activity by the Blue Cross and Blue Shield Federal Employee Program (FEP) participating Plan indicated above covering contracting activity for fiscal year 2012.  This information is submitted in accordance with and as required by U.S. Government, Office of Personnel Management (OPM) contract C.S. 1039, and other related rules and regulations.

Definition:  **Target Firm(s)** – Throughout this Subcontracting Plan the term "Target Firm(s)" will be utilized to refer collectively to Small Business, Women Owned Small Business, Small Disadvantaged Owned Business (SDB), HUBZone Small Business, Veteran Owned Small Business, Service Disabled Veteran Owned Small Business, Alaska Native Corporations (ANCs) and Indian Tribes that have not been certified by SBA as SDBs, and Alaska Native Corporations and Indian Tribes that are not small businesses.   When a reference is intended to refer to a specific grouping within the small business program, the name of that individual category(s) will be spelled out in its entirety.

2.    <u>Goals</u>

State separate dollar and percentage goals for targeted firm(s) in the following format.  (For a contract with options, provide a separate statement for the basic contract and individual statement for each option year.)

A.    Total estimated dollar value and percent of planned subcontracting with **small business** (include small disadvantaged and women-owned small businesses):  (% of "J")

<u>     $43,200,000.00     </u>    And    <u>          20%          </u>

B.    Total estimated dollar value and percent of planned subcontracting with **small disadvantaged businesses** (SDBs): (% of "J")

<u>     $12,960,000.00     </u>    And    <u>          6%          </u>

C.    Total estimated dollar value and percent of planned subcontracting with **women-owned small businesses**: (% of "J")

<u>     $10,800,000.00     </u>    And    <u>          5%          </u>

D.    Total estimated dollar value and percent of planned subcontracting with **certified HUBZone small business concerns**: (% of "J")

<u>     $6,480,000.00     </u>    And    <u>          3%          </u>

E.    Total estimated dollar value and percent of planned subcontracting with **veterans owned small business**: (% of "J")

<u>     $6,480,000.00     </u>    And    <u>          3%          </u>

F.    Total estimated dollar value and percent of planned subcontracting with **service disabled veterans owned small business**: (% of "J")
<u>     $6,480,000.00     </u>    And    <u>          3%          </u>

G.    Total estimated dollar value of planned subcontracting with **Alaska native corporations (ANCs) and indian tribes** that have not been certified by the SBA as SDBs. Must also be included in item 2-B.

<u>          $0.00          </u>

H.  Total estimated dollar value of planned subcontracting with **Alaska native corporations (ANCs) and indian tribes** that are not small businesses. Must also be included in item 2-A.

$0.00

I.  Total Estimated dollar value and percent of planned subcontracting with **large businesses** (all business concerns classified as "other than small"):  (% of "J")

$172,800,000.00    And    80%

J.  Total estimated dollar value of all planned subcontracting i.e., the sum of A and I above: $216,000,000.00 (100 per cent).

K.  The following table identifies the principal products and/or services to be subcontracted under this contract, and the types of targeted firm(s) supplying them: (check all that apply)

| Subcontracted Product/Service | Other | SB | SDB | WOSB | HUB-Zone | VOSB | DVOSB |
|---|---|---|---|---|---|---|---|
| Subscriber information systems | X | | | | | | |
| Software | X | X | | | | | |
| Computer equipment | X | X | | | | | |
| Claims processing | X | X | | | X | | |
| Data entry | | X | X | X | X | | |
| Printing | X | X | X | X | X | X | X |
| Training | X | X | | | | | |
| Premium items | | X | X | X | X | X | X |
| Audit services | X | X | | | | | |
| Graphic design services | | X | X | X | | | |
| Meeting services | X | | | | | | |
| Equipment rental | X | X | | | | | |
| Office furniture | X | X | | | | | |
| Office supplies | X | X | X | X | X | X | X |
| Building supplies | X | X | X | X | X | X | X |
| Building services | | X | X | X | X | X | X |
| Temporary help | | X | X | X | X | | |
| Subscriber research | X | X | X | X | | | |
| Technical consulting services | X | X | X | X | | | |

Provide a description of the method used to develop the subcontracting goals for targeted firm(s), i.e., explain the method and state the quantitative basis (in dollars) used to establish the percentage goals.  Include any source lists used in the determination process.

The various BCBS Plans (36+ Plans) each determine their own individual goals and objectives by methods consistent with the local Plan environment as well as their own history and

experience.  In all instances, the projection of a goal for an upcoming year involves looking at actual performance for the past period, considering approved budgets and financial plans for the upcoming period and making an educated estimate as to whether the past year's data contains any anomalies, or is of such a routine nature that it can be used, with minor adjustments, to reasonably reflect what can be expected in the upcoming period.

Past experience tends to be determined by one of either two methods.  Both of these methods involve the Plan classifying vendors by category, i.e. small, or large business, small women owned business, small disadvantaged owned business(SDBs), small HUBZone business, veteran and disabled veteran owned small business, Alaska native corporations (ANCs) and indian tribes that have not been certified by SBA as SDBs, Alaska native corporations (ANCs) and Indian tribes that are not small businesses.  The two methods are:

(a)     front end or zero based budget approach which involves looking at budgets, discussing with various department heads, etc., and determining what is anticipated to be purchased in the future period, and then breaking it down into what can reasonably be expected to be awarded to each of the four categories.

(b)     the back end or accounts payable approach, which is, to ignore actual contracts and purchase orders issued and look at the corporate-wide accounts payable files for the previous period.  The actual payments to vendors can then be analyzed by small business category, as well as cost or program objective.  It is then a simple enough process to either directly calculate an amount applicable to FEP by cost code, or to prorate an amount applicable to FEP in each category based on FEP as a proportion of the Plans total business.  This second method is the more common as it tends to bring in a fair share of indirect costs.  Once a firm picture of the previous period's business is defined, a reasonable estimate of the future period can be made.

This consolidated 2012 (fiscal year) FEP Subcontracting Plan is based on the following:

1. Actual SADBUS data for the period September 1, 2010 through March 31, 2011.

2. Total overall purchasing estimates submitted by the various BCBS Plans for Calendar year 2012.

3. Data contained in BCBS Plan SADBUS Subcontracting Plans for Fiscal Year 2012.

L.   Indirect costs have ___X___ have not _____ been included in the dollar and percentage subcontracting goals stated above. (Check one)

M.   If indirect costs have been included, explain the method used to determine the proportionate share of such costs to be allocated as subcontracts to targeted firm(s).

Indirect costs are included in most Plan estimates as a result of the method of calculation of the estimates as described in the preceding paragraph dealing with how the basic estimates are calculated.

3.   Program Administrator

Name, title, position within the corporate structure, and duties and responsibilities of the employee who will administer the Carrier's subcontracting program.

Name:          Dwight Wolfe

Title           Director Contract Administration

Address:       Blue Cross and Blue Shield Association
               1310 G Street, N.W.
               Washington, D.C. 20005

Telephone:     (202) 942-1283

Duties:  Has general overall responsibility for the Carrier's subcontracting program, i.e., developing, preparing, and executing individual subcontracting plans and monitoring performance relative to the requirements of this particular plan.  These duties include, but are not limited to the following activities:

A. Developing and promoting company-wide policy initiatives that demonstrate the company's support for awarding contracts and subcontracts to targeted firm(s); and assuring that targeted firm(s) are included on the source lists for solicitations for products and services they are capable of providing;

B. Developing and maintaining bidder's lists of targeted firm(s) from all possible sources;

C. Ensuring periodic rotation of potential subcontractors on bidders lists;

D. Ensuring that procurement "packages" are designed to permit the maximum possible participation of targeted firm(s);

E. Making arrangements for utilization of various sources for the identification of targeted firm(s) such as the SBA's Procurement IAE Central Contractor Registration (CCR), the National Minority Purchasing Council Vendor Information Service, the Office of Minority Business Data Center in the Department of Commerce, and the facilities of local small business and minority associations, and contact with Federal agencies' Small and Disadvantaged Business Utilization Specialists (SADBUS);

F. Overseeing the establishment and maintenance of contract and subcontract award records;

G. Attending or arranging for the attendance of company counselors at Business Opportunity Workshops, Minority Business Enterprise Seminars, Trade Fairs, Procurement Conferences, etc.;

H. Ensuring targeted firm(s) are made aware of subcontracting opportunities and how to prepare responsive bids to the company;

I. Conducting or arranging for the conduct of training for purchasing personnel regarding the intent and impact of Section 8(d) of the Small Business Act on purchasing procedures;

J. Monitoring the company's performance and making any adjustments necessary to achieve the subcontract plan goals;

K. Preparing, and submitting timely, required subcontract reports;

L. Coordinating the company's activities during the conduct of compliance reviews by Federal agencies;

M. Providing assistance to targeted firm(s);

N. Other Duties:

NONE

4.    Equitable Opportunity

Describe efforts the Carrier will make to ensure that targeted firm(s) will have an equitable opportunity to compete for subcontracts.  These efforts include, but are not limited to, the following activities:

A.  Outreach efforts to obtain sources:

1.   Contacting minority and small business trade associations;

2.   Contacting business development organizations;

3.   Attending small and minority business procurement conferences and trade fairs;

4.   Requesting sources from the Small Business Administration's Central Contractor Registration (CCR); and

5.   Developing a BCBS Plan wide register of targeted firms.

B.   Internal efforts to guide and encourage purchasing personnel:

1.   Presenting workshops, seminars and training programs;

2.   Establishing, maintaining and using small business, small disadvantaged business (SDBs), women-owned small business, veteran-owned and service disabled veteran-owned small businesses, HUBZone small business, Alaska native corporations (ANCs) and Indian tribes that have not been certified by SBA as SDBs, Alaska native corporations (ANCs) and Indian tribes that are not small businesses identified by source lists, guides and other data for soliciting proposals for potential subcontract awards; and

3.   Monitoring activities to evaluate compliance with the subcontracting plan.

C.   Additional efforts:

All of the above listed Outreach and Internal efforts are utilized by one BCBS Plan or another to ensure that targeted firms will have an equitable opportunity to compete for subcontracts.

In addition, several Plans, including the FEPDO utilize the National Minority Business Directory and the U.S. Encyclopedia of Associations to identify potential vendors.

5.    Flow-Down clause

The Carrier agrees to include the provisions under FAR 52.219-8, "Utilization of Small Business Concerns," in all subcontracts that offer further subcontracting opportunities and exceed the threshold for small purchases of $100,000.  All subcontractors, except small business concerns, that receive subcontracts in excess of $500,000 ($1,000,000 for construction) must adopt and comply
with a plan similar to the plan required by FAR 52.219-9, "Small Business Subcontracting Plan" (FAR 19.708(b)).

6.    Reporting and Cooperation

The Carrier gives assurance of (1) cooperation in any studies or surveys that may be required; (2) submission of periodic reports which show compliance with the subcontracting plan; (3) submission of Standard Form (SF)-294, "Subcontracting Report for Individual Contracts," and (SF)-295, "Summary Subcontract Report," in accordance with the instructions on the forms; and (4) ensuring that large business subcontractors with subcontracting plans agree to submit Standard Forms 294 and 295.

| Reporting Period | Report Due | Due Date |
|---|---|---|
| Oct 1 - March 31 | SF-294 | 04/30 |
| Apr 1 - Sept 30 | SF-294 | 10/30 |
| Oct 1 - Sept 30 | SF-295 | 10/30* |
| Oct 1 – Sept 30 | SMALL DISADVANTAGED BUSINESS (SDB) PARTICIPATION REPORT (SDB Dollar Listing by 3-digit NAICS Code) (Optional Form 312)** | 10/30 |

\*    The Carrier will be required to submit the SF-295 annually as shown in this chart.

\*\*  This report may be on any form (computer generated acceptable) desired by the Contractor, or Optional Form 312 title, SMALL DISADVANTAGED BUSINESS (SDB) PARTICIPATION REPORT may be utilized.  This report is a listing of dollars spent with SBA  certified Small Disadvantaged Business firms categorized into 3 digit NAICS code categories.

ADDRESSES

(a) SF-294 (includes local plan submissions) to be submitted by FEP to the FEHBP Program contracting officer; and

(b) SF-295 (includes local plan submissions) to be submitted by FEP to the FEHBP Program contracting officer. Copies should also be sent to the Insurance Policy and Information Division, Office of Insurance Programs, OPM, and to the cognizant SBA Commercial Market Representative.

7. Special

The following is a recitation of the types of records the Carrier will maintain to demonstrate the procedures adopted to comply with the requirements and goals in the subcontracting plan. The records will include, but not be limited, to the following:

A. If the Carrier is not using CCR as its source for targeted firm(s) list the names of guides and other data identifying such vendors;

B. Organizations contacted in an attempt to locate targeted firm(s);

C. On a contract-by-contract basis, records on each subcontract solicitation resulting in an award of more than $100,000 indicating (1) whether targeted firm(s) were solicited, and if not, why not; and (2) if applicable, the reason that the award was not made to a targeted firm;

D. Records to support other outreach efforts, e.g., contacts with minority and small business trade associations, attendance at small and minority business procurement conferences and trade fairs;

E. Records to support internal guidance and encouragement provided to buyers through (1) workshops, seminars, training programs, incentive awards; and (2) monitoring of activities to evaluate compliance; and

F. On a contract-by-contract basis, records to support subcontract award data including the name, address, and business size of each subcontractor. (This item is not required on a contract-by-contract basis for company or division-wide commercial plans.)

G. Additional Records:

NONE

This subcontracting plan was submitted by:

Signature: _____

Typed Name:      Jena L. Estes, CPA

Title:      Vice President, Federal Employee Program

Date Prepared:      June 15, 2011

Phone No.:      (202) 942-1230

Approval:

Agency:      *U.S. Office of Personnel Management*
Signature:      *Sylvia X. Pulley*
Title:      *Chief, Health Insurance Group I*
Date Approved:      *12/27/2011*
Phone No.      *202 606-1938*